

Baldwin, J., filed concurring opinion in which Almond, J., joined.

Lane, J., concurred in the result and filed opinion.

**Application of Oscar BASS, Jr., et al.**
**Patent Appeal No. 8660.**

United States Court of Customs
and Patent Appeals.

March 15, 1973.

Norman F. Oblon, Stanley P. Fisher, Marvin J. Spivak, Arlington, Va., Clifton T. Hunt, Jr., Charles R. Rhodes, Greensboro, N. C., attorneys of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1–9 of application serial No. 623,721, filed March 16, 1967,[1] for "Air Control System for Carding Machines." All claims are rejected on the ground of obviousness in view of the following references:

| Holden | 1,612,581 | Dec. 28, 1926 |
|---|---|---|
| Reiterer | 3,115,683 | Dec. 31, 1963 |
| Bass, Jr. et al. | | |
| (Bass) | 3,315,320 | Apr. 25, 1967 |
| | | (filed Aug. 23, 1965) |
| Jenkins, Sr. | | |
| (Jenkins) | 3,348,268 | Oct. 24, 1967 |
| | | (parent filed Oct. 13, 1964) |
| Fuji, | Japanese Patent Application No. 1025/63, | |
| | published Feb. 14, 1963. | |

Claims 1–9 are all rejected as unpatentable over Bass in view of Fuji. Jenkins was added in connection with claims 1, 6, 7, and 9 and Holden was also added in rejecting claim 9. The statutory basis of this rejection is primarily 35 U.S.C. § 103, which requires unobviousness of the claimed subject matter in view of "the prior art" of "the subject matter as a whole * * * at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Additionally, however, 35 U.S.C. § 102(g) is relied on to establish that the prior inventions of Bass and Jenkins, as shown in their patents, are "prior art."

Claims 2–5 are further rejected under 35 U.S.C. § 103 alone as unpatentable over Reiterer and Fuji, each in view of the other, those two references having clear prior art status under § 102(a) and (b).

The issues raised by this appeal are, first, whether § 102(g) makes available as "prior art," within the meaning of § 103, the prior invention of another who has not abandoned, suppressed or concealed it. Section 102(g) is set forth in full in the margin.[2] The remaining issues are the obviousness of the subject matter of the several claims in view of the available prior art.

*The Invention*

The joint invention of Bass, Jr., Jenkins, Sr., and Horvat is a vacuum system for controlling and collecting waste on carding machines. Carding is the process of cleaning, straightening, aligning, and forming textile fibers into sliver preparatory to spinning. The specification states:

> During the processing of a textile web on a carding machine, the web is fed by feed roll to a lickerin which in turn transfers the web to the main cylinder of the carding machine which rotates at a surface speed of up to and sometimes exceeding thirty-five miles

1. The application is stated to be a continuation-in-part of application serial No. 494,391, filed October 11, 1965.

2. § 102. *Conditions for patentability; novelty and loss of right to patent*

 A person shall be entitled to a patent unless—

 \* \* \* \* \*

 (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

per hour while the web is carried beneath working flats which align and attenuate the fibres in the web. Thereafter, the web is removed from the main cylinder by a doffer roll preparatory to forming it into sliver at the calender roll.

The parts above referred to are identified in Fig. 1 of the application drawings here reproduced:

[source of suction]

FIG. I

On the left, the lickerin is shown at 12 with its feed roll 14 to the left of it. The large main cylinder is in the center at 11 and the doffer roll is to its right at 13. The flats are shown in the form of an endless belt at 15. All this is conventional. The problem in such machines to which the invention is directed is explained as follows:

The rapid rotation of the lickerin and of the main cylinder creates surface air currents which swirl about the periphery of the main cylinder and are carried into the area beneath the main cylinder with the waste from the web. Such waste comprises short fibre, seeds, dirt and foreign matter, all of which is undesirable in the finished web. It is conventional practice to install a screen about the lower periphery of the main cylinder for the purpose of cleaning such waste material as just described from the card clothing on the main cylinder before that portion of the main cylinder passing over the screen again comes into contact with the web delivered to the main cylinder from the lickerin. In the drawing, the screen is shown at 16, under main cylinder 11. The specification further states:

In the past, the surface air currents along the periphery of the main cylinder have passed through the screen with the waste material, and the air currents have propelled this waste material outwardly from the area beneath the main cylinder and into the atmosphere where it settles on webs being processed and lessens the quality of the webs. Attempts have been made to prevent the blowing of the waste material into the atmosphere by enclosing the air beneath the main

cylinder in an effort to contain the waste within that area. However, the super-atmospheric pressure conditions created through continuous delivery of the surface air through continuous delivery of the surface air currents generated by the rapid rotation of the main cylinder into the area therebeneath have invariably resulted in "blowouts", that is, the propulsion of air-borne waste through openings left accidentally in the enclosure, it being virtually impossible to render the area beneath the main cylinder sufficiently air-tight to contain the ever-increasing air pressure therebeneath generated by the rotation of the cylinder and lickerin.

Directed to the solution of these problems, appellants describe their invention in general terms as follows:

To this end, there is provided a unique combination of elements which cooperate with each other to minimize the air pressure beneath the main cylinder without reducing its speed and to control the disposition of waste in the area beneath the main cylinder. More specifically, the invention comprises [1] an enclosure for the area beneath the main cylinder whereby it is rendered as airtight as practical, [2] means closely adjacent the transfer points of the web from the lickerin to the main cylinder and [3] from the main cylinder to the doffer for relieving or drawing off air pressure created through rotation of the main cylinder and lickerin to reduce the air pressure beneath the main cylinder and while also drawing off fly and lint released at said transfer points and, preferably, [4] means carried by the screen beneath the main cylinder for controlling the flow of air currents toward the center of the carding machine and away from its edges whereby to further minimize the danger of "blowouts" carrying waste into the atmosphere. [Bracketed numbers ours.]

The elements above identified as 2, 3, and 4 are located as indicated on Fig. 1 by the letters B, F, and J which we have added and are more particularly described by appellants as follows:

As to B—

A lickerin suction nozzle 26 is * * * arranged to draw in air currents passing upwardly from beneath the main cylinder 11 between the main cylinder and the lickerin 12 and which would otherwise pass into the atmosphere carrying lint and fly and other waste material with them * * *. The suction nozzle 26 also preferably includes an opening directed to draw in air currents released adjacent the feed roll 14 and which carry with them short fibres and lint released from the web at the feed roll.

The suction nozzle 26 is preferably of the type shown in prior application Serial No. 481,659 filed August 23, 1965 by Oscar Bass, Jr. and Ivan Horvat and entitled PNEUMATIC CLEANING MEANS AND METHOD FOR CARDING MACHINES. [This is the Bass, Jr. et al. reference.]

As to F—

In order to further reduce the air pressure in the area beneath the main cylinder, a second suction nozzle 33 * * * is positioned between the doffer 13 and main cylinder 11 * * *. Positioned as illustrated * * * doffer plenum 33 * * * presents a negative pressure zone which attracts a significant portion of the air currents created through the clockwise rotation of the main cylinder before these currents are delivered into the area beneath the main cylinder. In so doing, the nozzle 33 contributes materially to the reduction of air pressure in the area beneath the main cylinder over prior known installations. The closer the air pressure in the area beneath the main cylinder is brought to atmospheric pressure, the less "blowout" occurs and the more the waste passing through the screen

16 is desirably retained within the enclosed area.

As to J—

Figure 3 is a partial plan view of the main cylinder screen removed from the carding machine for purposes of illustration:

FIG. 3

Bars or baffles 40, which extend parallel to the axis of the main cylinder, taper inwardly toward the central rib 41. The surface air currents generated by the main cylinder are thus channelled away from the sides of the screen, and towards its center. The screen is curved to fit the cylinder.

The screen 16 * * * is of the type more fully described in prior copending applications Serial No. 403,-468 filed October 13, 1964 now abandoned, and Serial No. 582,191 filed September 6, 1966 by Robert Bain Jenkins, Sr. entitled SCREEN FOR CARDING MACHINES. [This is the Jenkins, Sr., reference.]

Claims 1 and 2 are representative (emphasis ours):

1. A vacuum system for controlling and collecting waste on carding machines of the type having a lickerin, a main cylinder, *a screen* beneath the main cylinder, and a doffer roll; said device comprising:

(a) *a source of suction;*

(b) *a first suction nozzle* disposed above the lickerin and arranged adjacent the point where the surfaces of the lickerin and cylinder diverge to draw off surface air currents created through rotation of the lickerin and main cylinder;

(c) *a second suction nozzle* disposed between the main cylinder and the doffer adjacent the point where the surfaces of the doffer and main cylinder converge to draw off surface air currents generated through rotation of the main cylinder as well as lint and fly released at the transfer point of the web between the main cylinder and the doffer;

(d) *said screen comprising:*

i.) a frame having a longitudinal axis and including a pair of longitudinally extending parallel side members spaced from each other and on opposite sides of said longitudinal axis; and

ii.) channeling means extending between said side members channeling more of said air currents through said screen intermediate said side members than at said side members, said channeling means comprising a plurality of air obstructing elements, each element having a face, the faces of said air obstructing elements being narrower adjacent said longitudinal axis than adjacent said side members; and

(e) [sic] whereby air pressure in the area beneath the main cylinder is minimized and waste passing through the screen is collected in the central portion of the area beneath the main cylinder.

2. A vacuum system for controlling the disposition of waste generated by processing of a textile web on a carding machine having a lickerin, a

main cylinder, and a doffer, said device comprising:

(a) *first suction means* arranged adjacent the lickerin to draw off surface air currents generated through rotation of the main cylinder and lickerin;

(b) *second suction means* arranged adjacent the point where the surfaces of the doffer and main cylinder converge to draw off surface air currents generated through rotation of the main cylinder at the nip of the main cylinder and the doffer; and

(c) [sic] said first and second suction means *cooperating* with one another to reduce the air turbulence in the area beneath the main cylinder.

Claims 3–9 all depend either directly or indirectly on claim 2. Claim 3 recites that the lickerin, main cylinder, and doffer are mounted on a frame and that the area beneath them is enclosed. Claim 4 more specifically describes the two suction means. Claim 5 specifies air flow rates for the two nozzles. Claims 6 and 7 additionally recite appellants' screen baffle structure. Claim 8 depends on claim 4 and describes the particular lickerin suction nozzle. Claim 9 depends on claim 6 and additionally recites a lickerin screen.

### The References

Holden shows the use of a lickerin screen as recited in claim 9.

Reiterer discloses the use of a suction nozzle adjacent the point where the lickerin and main cylinders diverge.

Bass essentially describes the likerin suction nozzle used by appellants. (B in Fig. 1). The patentees are the present appellants Bass and Horvat.

Jenkins essentially shows the main cylinder screen used by appellants (J in Fig. 1) and the patentee is appellant Jenkins.

Fuji discloses the use of a suction nozzle at the point where the main cylinder and the doffer converge (F in Fig. 1).

Another reference, a U. S. Patent to O'Neal No. 3,304,582 with a filing date of October 2, 1964, no longer relied on, as well as the Jenkins and Bass references, caused appellants to file affidavits under Rule 131 in an effort to antedate these three references. The affidavits were accepted as overcoming O'Neal. As to the Bass and Jenkins references, the examiner said in his final rejection that while the affidavits may overcome them so far as 35 U.S.C. § 102(e) is concerned, because the affidavits antedate the *filing dates* of those two patents, they are not overcome as disclosing *prior inventions* of "another" under 35 U.S.C. § 102(g). He relied on the Board of Appeals decision in Ex parte Robbins and Porter, 156 USPQ 707 (1967), from which he quoted as follows, the opinion being by Federico, Examiner-in-Chief:

However, assuming that the affidavits were sufficient, the reference *is not necessarily removed* (emphasis added) in view of the relationship of the parties and the common ownership. There is still section 102(g) to consider. Under this provision the prior invention of another, meeting the conditions specified [in § 102(g)], is prior art with respect to a later invention. The invention claimed in the Porter et al. patent is taken as having been made prior to the date the invention claimed in the present application was made * * *.

That is the end of the examiner's quotation but the board opinion continued, saying, "in view of the facts present in this case, and hence is available as prior art."[3] Applying the *Robbins* statement

---

3. This and related discussion in the case may be characterized as dicta for two reasons: The affidavits were held *not* to be sufficient and the claims on appeal were held to be unobvious even when the Porter et al. patent was treated as prior art.

Even as dicta, the statements stand as the view of at least that panel of the board on the legal effect of § 102(g) in establishing the prior invention of another as prior art under § 103.

to the case before him, the examiner held:

Therefore, under 35 U.S.C. § 102(g), the affidavits do not remove either Jenkins, Sr., or Bass, Jr., et al as a reference.

In his Answer, the examiner adhered to this position, adding the following:

Further, it should be noted that the structure of the screen in claims 1, 6, and 7 of the present application is defined word for word as the screen defined in claims 6 and 1 of the Jenkins, Sr. patent.

The practice of antedating a reference is directed to proving that applicant's invention is of earlier date than the invention of the reference and this could not be the case when both are of identical origin. The nature of the subject matter claimed in the patents and present application, the relationship of the parties and the apparent common ownership, and the respective order of the filing dates of the applications involved indicate the order in which the inventions were made.

The board agreed with the examiner's holding on the availability of the Bass and Jenkins patents as references to show prior art. It agreed with and approved his reliance on Ex parte Robbins. The significant thoughts added by the board are the following (emphasis added):

Proof that the over-all combination recited in the claims on appeal was made prior to the *filing dates* of the Bass, Jr. et al. and Jenkins, Sr. patents does not establish that such combination was *invented prior to the subcombinations* claimed in said patents.

\* \* \* \* \* \*

Under the circumstances here involved it does not appear that an affidavit under Rule 131 was the proper procedure to adopt. The proper sub-

ject of inquiry is not compliance with that Rule but rather what [the] evidence shows [as to] who invented the subject matter of the references which is relied upon and when.[4]

The board then proceeded to a discussion and affirmance of the rejection of all claims for obviousness on the bases first above recited.

Appellants' argument in this court is along three lines. They argue unobviousness of the inventions of the appealed claims over all the references, unobviousness over the references exclusive of Bass and Jenkins, and the impropriety of using Bass and Jenkins as prior art under § 102(g). The last point certainly is the point principally argued.

Appellants' brief refers to the rejection in this case as "a section 102(g) rejection," which it is not, and we therefore clarify that matter at the outset. The rejection is for obviousness under § 103 based in part on alleged prior inventions of others which are deemed to be "prior art" within the meaning of that term in § 103 by virtue of § 102(g). The essence of appellants' argument against this use of § 102(g) is that it is concerned only with "identity of invention." They say, "The applicants' invention must be *the same* as the invention of another." Since that is obviously not the case here, so their argument runs, § 102(g) "is out and Rule 131 is in." Appellants argue that the *Robbins* case is distinguishable because it was a case of identical inventions. This, however, is not so. The examiner had rejected the claims, inter alia, for obviousness and when the board rephrased his rejection, after pointing out certain errors, it did so as follows:

The claims are rejected as unpatentable over Porter et al. and Fuchs et al. on the basis of sections 102 and 103 of the statute, the Porter et al. invention being available as prior art on the ba-

4. Compare this statement with footnote 4 in In re Facius, 408 F.2d 1396, 56 CCPA 1348 (1969), and footnote 11 in In re Land and Rogers, 368 F.2d 866, 54 CCPA 806 (1966).

sis of 102(e) as disclosed in the specification of the patent, no proper affidavit having been filed, *and* on the basis of 102(g) as the prior invention of another.

Rejections are not based on § 103 when they are identical with the prior art. They rest, in such a case, on § 102 alone.

In addition to contending that § 102(g) "is out" because the application is claiming separate and distinct inventions from what is claimed in the Bass and Jenkins patents, appellants argue that they are not proper references "since applicants [Bass, Jenkins, and Horvat] were working together on a common project, as evidenced by the facts in the Rule 131 affidavit * * *." They then add that "the appellants freely admit that they did not invent the claimed subject matter of the Bass, Jr. patent or the Jenkins, Sr. patent * * *."

### OPINION

#### § 102(g) Prior Invention as "Prior Art" under § 103

Narrowly considered, the issue presented by the facts of this case is one of first impression in this court. This is by no means the first time we have passed on whether § 102(g) prior invention of another is prior art, as will be shown, or even the first time we have considered whether such prior invention can be combined with other prior art to sustain a § 103 obviousness rejection. However, it is the first time we have considered combining § 102(g) and § 103 in the context of an ex parte rejection entirely divorced from the award of priority in an interference which established the prior inventorship relied on in rejecting.

In this situation the factual evidence we have to go on is what appears from the references themselves in their disclosures, their interrelationship with the application at bar and their filing dates, and what appellants have revealed in their Rule 131 affidavits as to who invented what and when. To these facts we have to apply the law.

This court has several times approved of rejections based on a combination of § 102(g) with § 103. The first case so holding is believed to be In re Gregg, 244 F.2d 316, 44 CCPA 904 (1957). Our opinion in that case states (emphasis added):

> The award of priority in the interference was a final determination that any invention common to appellant's application and that of Coakwell was made by Coakwell prior to appellant's invention thereof. Coakwell's disclosure [5] thus constitutes prior art *within the meaning of Section 102(g)* of the Patent Act of 1952 *and, in accordance with Section 103* of that Act, appellant may not obtain any claim which distinguishes from Coakwell's disclosure [5] only in matters which would have been obvious to a person having ordinary skill in the art at the time the invention was made.

> * * * * * *

We are *unable to agree with appellant that the prior art referred to in Section 103* of the 1952 Act *is limited to art which was available to the public* prior to the date of the applicant's invention.

In In re Taub, 343 F.2d 556, 52 CCPA 1675 (1965), the ex parte rejection under review was of claims to chemical compounds based on the count in an interference which appellant Taub had lost. We found error in the Patent Office notion that every compound within the *scope* of the lost count was "prior art" in the sense of § 102(g) as "[an] invention * * * made in this coun-

---

5. In order not to mislead, attention is called to the fact that, as to using the whole disclosure, *Gregg* was later modified in this respect by a number of decisions including *Taub*, *Yale*, and *Risse*, discussed hereinafter, and also by In re Bandel, 348 F.2d 563, 52 CCPA 1775 (1965). *Bandel* likewise recognizes using § 102(g) prior art in making a § 103 rejection, but without specific reference to either section.

try by another," "before the applicant's invention." The winning of priority on the broad count was based on evidence of priority with respect to one species only. Taub, however, was the prior inventor as to the species claimed in the application on appeal. We treated the whole question of the prior invention of another, as determined by an interference priority award, as under § 102(g), reversed the rejection, and remanded the case to the Patent Office for a determination of whether the species claimed by Taub was obvious. Obviousness being a § 103 issue, we were thus coupling § 103 with § 102(g) as a basis for determining patentability in the context of a post-interference ex parte patentability determination.

On the same day as *Taub*, we decided In re Yale, 347 F.2d 995, 52 CCPA 1668, 146 USPQ 400 (1965), another post-interference ex parte rejection case. Therein we said that the pertinent portions of 35 U.S.C. were § 102(g) and § 103 and the significant statement in the opinion is this (emphasis added):

> As we recently pointed out in In re Harry, 333 F.2d 920, 51 CCPA 1541, the legislative history of 35 U.S.C. § 102 and § 103 makes it clear that the "prior art," which section 103 requires us to compare with "the subject matter sought to be patented" in a given situation, refers to *at least the statutory prior art material named in section 102*. It seems clear that the three chemical compounds which appellant lost in interference by concession of priority are materials of which it must be said "before the applicant's invention thereof the invention was made in this country by another."

Those last-quoted words are, of course, from § 102(g). The opinion continues:

> Those compounds become "prior art" within the meaning of 35 U.S.C. § 103 and, in accordance with that provision, appellants may not obtain any

claim which distinguishes over that "prior art" only in matters which would have been obvious to one having ordinary skill in the art *at the time appellants' invention was made*. [Original emphasis.]

This was a clear holding that § 102(g) prior invention is "prior art" within the meaning of that term in § 103, like the other prior art material named in § 102.

Two years later we decided In re Risse, 378 F.2d 948, 54 CCPA 1495 (1967). Judge Almond, speaking for the court, said:

> Proceeding now to the matter of statutory prior art, we think it is well settled that prior art under 35 USC 103 includes prior invention under 35 USC 102(g). See, e. g., *In re Yale*, supra.

He then set forth § 102(g), in part, and continued,

> At a minimum, prior invention under section 102(g) includes the subject matter of the interference counts, which may be used as evidence of prior art under section 103.

Throughout the rest of the lengthy opinion § 102(g) and § 103 are jointly referred to repeatedly as the statutory basis on which the question of obviousness must be decided.[6]

Within a couple of days of *Risse* the Patent Office Board of Appeals decided *Robbins*, the case relied on by the examiner herein. It held that a copending patent of Porter and Ellerbee, assigned to the assignee of the appealed Robbins and Porter application, could be relied on under § 102(g) with respect to the invention claimed therein as the invention of another, assumed to be prior under the circumstances which included a common assignee, different inventor entities, filing a year and a half before the application on appeal, and evidence in Rule 131 affidavits and in the application itself indicating the order in which the inventions were made.

---

6. Recently in In re Smith, 458 F.2d 1389, 59 CCPA —— (1972), another part of the *Risse* opinion was modified but the matter of using § 102(g) prior invention as "prior art" under § 103 was not thereby affected.

From the above decisions it is clear beyond question that in using § 102(g) prior art to support a rejection it has not been limited to situations involving "identity of invention," as appellants contend, but has repeatedly been used to support the rejection of claims to different but obvious inventions under § 103.

As a general proposition of law, and particularly considering the way in which full anticipation situations under § 102 shade into obviousness rejections under § 103 because of discernable differences, we cannot sanction an interpretation of the statute under which a prior invention is "prior art" under the former situation but not under the latter.

The situation presents a close parallel to the situation under § 102(e) which was dealt with by this court in In re Harry, 333 F.2d 920, 51 CCPA 1541 (1964), and by the Supreme Court a year later in Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). In *Hazeltine* the patentee tried in vain to do the very thing appellants attempt here, namely, to distinguish between § 102 full anticipation and § 103 obviousness rejections. A parallel attempt was made in *Harry* with respect to § 102(e). In *Hazeltine* the Court gave this answer (emphasis added):

> Petitioners suggest, however, that the question in this case is not answered by mere reference to § 102(e), because in *Milburn* [Alexander Milburn Co. v. Davis-Bournonville Co., 270 U. S. 390, 46 S.Ct. 324, 70 L.Ed. 651], which gave rise to that section, the co-pending applications described the same *identical invention*. But here the Regis invention is not precisely the same as that contained in the Wallace patent, but *is only made obvious* by the Wallace patent in light of the Carlson patent. We agree with the Commissioner that *this distinction is without significance here.*

In *Harry*, in discussing the § 102(e) + § 103 rejection our summation reads (emphasis added):

In our opinion, *the "prior art" referred to in § 103 includes* along with the patents, printed publications, public uses and sales of paragraphs (a) and (b) of section 102, *prior invention* as established by a copending application, *if* it becomes a patent, as contemplated by paragraph (e) and as held in the *Milburn* case. Such *prior invention,* as prior art, *may be combined with other references to sustain a rejection for obviousness* under section 103.

Such being the law as to prior invention established under § 102(e), as it surely is with the Supreme Court's approval, we see no reason a different rule should prevail when the prior invention is otherwise established, as by the circumstances of the case, an adverse ruling in an interference, admissions by the applicant, or otherwise, the statutory basis for using the prior invention being § 102(g).

It is not a new idea that what is prior art for one purpose is prior art for all purposes. Judge Learned Hand, speaking for the Second Circuit Court of Appeals in Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345 (1945), said, at the end of a long discussion of the "plausible" argument that there should be a distinction between a prior invention under the *Milburn* rule which fully anticipates and one which merely makes obvious,

> * * * once the first application is treated as prior art when it *fully anticipates,* there seems to be no reason to deny it *whatever effect it would have as prior art,* if it were literally such. [Emphasis added.]

█ It is our view that the law as applied in the Patent Office must be uniform with the law as applied in the courts in passing on patent validity. It is our belief that that is what it is doing in this case. Cases directly in point are rare but we know of at least two, Sutter Products Co. v. Pettibone Mulliken Corp., 428 F.2d 639 (7th Cir. 1970) and Grinnell Corp. v. Virginia Electric &

Power Co., 277 F.Supp. 507 (E.D.Va. 1967).

In *Sutter* the Seventh Circuit Court of Appeals gave extended consideration to an *obviousness* defense based · on prior invention *under § 102(g)* as the prior art. It first held that a Harrison '134 patent "may be considered as a prior invention under 35 U.S.C. § 102(g)," quoting the statute in full in a footnote. It then considered the argument that even if it *could* be relied on to establish "anticipation," it would *not* be considered "prior art" to show obviousness under § 103, the prior art of that section being confined to matters of public knowledge. That argument is found "without merit." It cited the *Hazeltine* case as rejecting the notion that "prior art" included only "publicly available information." It then said (emphasis added):

> Although Hazeltine Research dealt with the specific correspondence between Section 103 and Section 102(e), the considerations expressed are equally applicable to prior invention under Section 102(g). Application of Yale, 347 F.2d 995, 1000, 52 CCPA 1668 (1965); Application of Risse, 378 F.2d 948, 956, 54 CCPA 1495 (1967). The correspondence between the relevant *"prior art" under Section 103* therefore *includes all material which would be considered to determine novelty under Section 102*. See Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1233 (7th Cir. 1969), certiorari denied 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648, 165 USPQ 290.

On this construction of the law, the Sutter patents in suit were held invalid for failure to meet the requirements of § 103. In discussing standards of patent-

ability, the *Deep Welding* case, cited in *Sutter,* said, inter alia,

> If the state of the art anticipated or made obvious the invention sought to be patented, 35 U.S.C. § 103 (as well as §§ 102(a), (b), (e) or (g)) requires a holding of invalidity.

Now considering *Grinnell,* an earlier decision by a single District Court Judge, the discussion appears under the heading "IV. Suozzo's Work." Suozzo was working contemporaneously with the inventor of the patents in suit, and keeping his work secret. The defendant apparently asserted invalidity on the basis of § 102(g) + § 103 and the court found nothing wrong with such a legal proposition. It quoted § 102(g) as being applicable but found, in reliance on the express language of § 102(g), that Suozzo had "suppressed and concealed" his work, for which reason it could not be considered. The court stated (emphasis added):

> The same reasons of public policy which forbid prior *suppressed and concealed activities* from invalidating a patent under 35 U.S.C. § 102(g) are also applicable to 35 U.S.C. § 103.

Clearly it was taking the two sections together as a basis for decision. The case is an example of how the "not * * * suppressed or concealed" clause serves to prevent the use of truly "secret" prior invention as prior art under § 103.[7]

 In view of the foregoing decisions and principles, we rule against appellants and hold that the use of the prior invention of another who had not abandoned, suppressed, or concealed it under the circumstances of this case which include the disclosure of such invention in an issued patent, is available

---

7. It may be wondered why, in the twenty years since § 102(g) came into effect, there have not been more adjudicated cases reported relying on it to show "prior art" in support of a § 103 rejection. The answer probably is that there are many other defenses much easier to establish and it is a rare case where the effort of going back to the date of invention of a prior inventor is worth the cost. In particular, § 102(e) makes patents unquestioned prior art for all purposes as of their United States filing dates and the date of invention is usually not enough earlier to make a difference in the result.

as "prior art" within the meaning of that term in § 103 by virtue of § 102(g).

### Prior Invention

Having settled the question of law, it remains to determine what the evidence shows as to the priority of the Bass and Jenkins inventions, upon which their availability as prior art depends.

From the evidence available to it, the initial burden of making out a prima facie case of prior invention is on the Patent Office. In re Warner, 379 F.2d 1011, 54 CCPA 1628 (1967) states:

> We think the precise language of 35 USC 102 that "[a] person shall be entitled to a patent unless," concerning novelty and unobviousness, clearly places a burden of proof on the Patent Office which requires it to produce the factual basis for its rejection of an application under sections 102 and 103, see *Graham* [Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545] and *Adams* [United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572].

When the Patent Office has made out a prima facie case of priority the burden would then shift to the applicant to rebut it.

The evidence of priority in the record consists of filing dates, the contents of the application and reference patents, statements in affidavits filed and accepted under Rule 131, and statements by appellants' attorneys during prosecution.

The earliest date of invention alleged by appellants for their combination is the date of conception, February 10, 1964. Reduction to practice is alleged in April 1964. Their effective filing date is October 11, 1965.

First, we consider Jenkins, asserted to be the prior inventor of the tapered bar screen element of the claimed combination. The affidavit evidence asserts that the screen was conceived "before December 6, 1963" and built according to a drawing dated December 5, 1963.[8] It was installed in the first prototype of appellants' combination about April 17, 1964. Assuming that to be the first reduction to practice of the screen, as well as of the combination, the record contains an admission of its conception by Jenkins about two months before appellants claim to have conceived the combination. The Jenkins invention would appear, prima facie, to be prior on the basis of prior conception and simultaneous reduction to practice, which makes diligence irrelevant. Whittier v. Borchardt, 154 F.2d 522, 33 CCPA 1023 (1946), Lassman v. Brossi, 159 USPQ 182 (Bd.Pat.Intf.1967). In the absence of any traverse, even in appellants' brief, this screen appears to be a prior invention under § 102(g). While we have said that there is no *necessary* relationship between the order of making inventions and the order of filing applications on them, In re Land and Rogers, 368 F.2d 866, 54 CCPA 806 (1966), we think there is further evidentiary significance in the fact that Jenkins filed October 13, 1964, and appellants did not file for nearly a year thereafter, on October 11, 1965. On the basis of all the evidence of record, we accept the Jenkins screen as described in his patent, to which reference is made in the application at bar, as prior art.

We turn now to the Bass and Horvat reference (Bass). The invention of these patentees is the "first suction nozzle," element "(b)" in claim 1, located at the lickerin end of the machine, "B" in Fig. 1. The only argument the solicitor makes on the priority issue is that "the affidavits make no attempt to show that the invention of Bass and Horvat was not prior to the invention of appellants." We do not think it was incumbent on the applicants to prove it was *not* prior, merely because the Patent Office thinks it might have been. Like the solicitor, we are not able to find any evidence of

8. The affidavit states, apparently erroneously, that the drawing was "made December ber 6, 1963." The drawing is dated "12–5–63."

priority on the part of Bass. The examiner mentioned none except the filing date of the Bass application "approximately 7 weeks before the earliest effective filing date of the present application." We do not consider this probative of priority *of invention*. In re Land and Rogers, supra. The time is too short to be significant. The cross reference in the present application to the Bass application does not indicate that it was a prior invention. While the board correctly said that the proper subject of inquiry is what the *evidence* shows as to who invented the subject matter of the references and when, it failed to refer to any evidence of priority in Bass.

Appellants' position with respect to Bass is "that the Bass, Jr. et al lickerin plenum and the instant combination were part of the same research and development program and were invented simultaneously, as opposed to the Patent Office's position that the Bass, Jr. et al lickerin plenum was invented previous to the combination merely because it was filed first." Finding no substantial evidence of record tending to indicate priority in Bass, we believe the appellants' position to be sound. In fact, it appears as logical on the facts of this case to find that the claimed combination was conceived before the Bass plenum as described in the reference patent. We therefore exclude Bass from consideration as prior art in passing on the obviousness rejection.

### The Rejections of Claims

Claims 2, 3, 4, and 5 were rejected as obvious in view of Reiterer and Fuji. We have carefully considered appellants' argument but agree with the decision on obviousness and this rejection is affirmed.

The rejection of all remaining claims, 1, 6, 7, 8, and 9, was predicated on Bass combined with Fuji, Jenkins being added in rejecting claims 1, 6, 7, and 9. With the elimination of the Bass reference, there is no suggestion in the remaining references applied of the suction means at the lickerin side of the carding machine and no basis for a holding of obviousness of the combination of which it is a principal element. It is, therefore, necessary to reverse the rejection of these claims.

### Comments on Judge Baldwin's Concurring Opinion

This concurring opinion is in reality a dissent. The only concurrence is with the final disposition of the claims. On the principal point of law involved in this case there is total disagreement. The concurring opinion expresses the view that prior invention under § 102(g) is not "prior art" under § 103 *unless* the priority happens to have been established in an interference, when it *is* "prior art" under § 103. Since there has been no interference here, the position taken is that the Bass patented suction nozzle and the Jenkins patented main cylinder screen would not be "prior art" under § 103 even if the priority of these inventions were firmly established by evidence, and so these inventions must be ignored in determining obviousness under § 103, on which basis the same result is reached that we reach. It also expresses the view that although prior inventions under § 102(g) are prior art which can be used to sustain a full anticipation rejection under § 102, they cannot be used to sustain an obviousness rejection under § 103—that prior art is not prior art for all purposes. We consider this position anomalous.

Much of what this concurring opinion says is contradicted by what has already been said above but since certain fundamental considerations appear to have been overlooked they will bear summarizing in the interest of clarifying our position.

First of all, it is tolerably clear that this opinion does not change the law as it has been for 20 years, if not longer, in this court as well as elsewhere. The concurrence has no answer for cases like Sutter Products v. Pettibone Mulliken, 428 F.2d 639 (7th Cir. 1970) and there

is no "long line" of cases in this court being overruled. Only two are named, *Newton* and *Frilette*, about which more anon.

We are charged with holding as we do while remaining "silent" as to reasons why we should do so. We have not been silent, we have been ignored. *Reason No. 1*, supra, is that full anticipation under § 102 shades so gradually into obviousness under § 103 that it is not practicable to try to operate a patent system on the basis that that which is prior art for full anticipation situations is not also prior art for determining obviousness (which is a *partial* anticipation, using "anticipation" in a nontechnical but realistic sense). *Reason No. 2*, supra, is that it would be anomalous to have existing, side by side, the law of § 102(e), *Hazeltine*, and In re Harry, which is that an invention which is prior as of the U. S. filing date of an issued patent disclosing it is prior art for *both* § 102 anticipation and § 103 obviousness rejections, and law as the concurrence would have it, namely, that an invention otherwise established by evidence to be prior to an applicant's invention is prior art *only* for § 102 anticipation and not in determining § 103 obviousness. *Reason No. 3*, supra, is that what we hold to be the law is already the law in infringement suits, as the concurrence tacitly admits, though it does not consider such decisions to be "binding on this court." However, the law *must* be the same in this court and in other courts which pass on patent validity. *Reason No. 4* is that if the question here decided were presented to the Supreme Court it would almost certainly, in view of *Milburn* and *Hazeltine*, affirm our decision on the applicability of § 102(g).

■ In short, prior art for one purpose is prior art for all purposes and in all courts and in the Patent Office. On one matter the concurrence maintains a significant silence. Throughout, it takes it for granted that prior invention under § 102(g) *is* prior art which will support a rejection of claims to the *same* or substantially the same invention. Without emphasis on the fact, the entire concurrence carefully limits its discussion to the status of "a non-anticipatory reference." It attempts to develop, as an assumed part of the law, a spurious distinction between "prior art" and "prior invention," a *"prior art* defense" and a *"prior invention* defense." Regardless of what may have been said in three opinions written in 1902, 1912, 1916, long before *Milburn* and *Hazeltine*, prior invention *is* prior art and always has been. The only distinction which exists is between anticipation and obviousness and the determination of either depends on what is in the prior art. Its status as prior art is not determined by whether it fully discloses or only partially discloses the claimed invention.

The concurrence also admits that lost counts in interference—which is but one way of establishing prior invention—are properly used as the basis for rejections, not only of the *same* invention but also of those obvious in view of the prior invention thus established. We may now add as *Reason No. 5* that it makes no sense to distinguish one prior invention from another according to the *manner* in which its priority has been established. This brings us to an error of reasoning in the concurrence which treats what we are doing as "pushing back" the effective dates of references and to the use made of our remarks in the first *Hilmer* opinion.[9] We are not pushing back the dates *of references*. As shown above, the *evidence* of *prior* invention in this case was not found *in the references* but in affidavits, admissions, and circumstances taken together with the disclosures of the references identifying the prior *subject matter*. *Hilmer* was a different situation altogether where we *were* asked to push back reference dates by reason of 35 U.S.C. § 119 to events taking place abroad, contrary to what we found to be the express desire of

9. 359 F.2d 859, 53 CCPA 1288 (1966).

Congress and statutory limitations to events in the United States.

The *Hession* case and its "doctrine of election" by an assignee has no bearing at all on the problem here. The writer has some slight familiarity with that case as the author of the 20-page dissenting opinion. The case is irrelevant because it did not involve two inventions, two inventors, prior invention, or priority. There was a single invention made by a single inventor, Hession. Ziherl fraudulently, or at least erroneously, filed an application on Hession's invention, having invented nothing himself, as he acknowledged. The election to which the concurring opinion refers was not "with respect to priority," as alleged, but resided in *issuing the patent* on the Ziherl application instead of the Hession application when Ziherl was not the inventor. This court's majority opinion says nothing about anyone being a "first" or a "prior" inventor because we were well aware there was but one inventor.

The concurrence worries about our decision making a lot of issued patents invalid, which presumably would not otherwise be. The concern is misdirected. Since we are making no change in the law—*certainly* no change as it is applied by other courts in infringement suits—no more patents will be invalid than is already the case. (The Patent Office never has and never will be able to examine applications as to all defenses to validity. See 35 U.S.C. § 282(2). However, should the law be as the concurrence would have it, the Patent Office would be compelled to issue *more* invalid patents by being barred from applying the law as other courts apply it. This is the amazing choice the concurrence makes out of fear of nightmarish situations of its own imagining. In all the years we have had the law as we now declare it to be none of them has materialized.

The concurrence makes the erroneous statement that in past cases we have based our thinking on "the proposition that *everything* in section 102 is prior art" (original emphasis). The anatomy of § 102 is fairly clear. As forecast in its heading, it deals with the two questions of "novelty and loss of right." It also deals with originality in subsection (f) which says that one who "did not himself invent the subject matter" (i. e., he did not originate it) has no right to a patent on it. Subsections (c) on abandonment and (d) on first patenting the invention abroad, before the date of the U. S. application, on an application filed more than a year before filing in the U. S., are loss of right provisions and in no way relate to prior art. Of course, (c), (d), and (f) have no relation to § 103 and no relevancy to what is "prior art" under § 103. Only the remaining portions of § 102 deal with "prior art." Three of them, (a), (e), and (g), deal with events prior to applicant's *invention* date and the other, (b), with events more than one year prior to the U. S. *application* date. These are the "prior art" subsections.

The concurrence discusses many of our prior decisions dealing with "double patenting" rejections. They are not germane to the present case. Rejections for double patenting have nothing in common with rejections based on prior invention. The two types of rejection rest on different legal footings. Among the cases *classed by the concurrence as double patenting decisions* are the two which constitute the "long line" of cases we are supposed to be overruling, *Newton* and *Frilette*. It is well to understand that they *are* double patenting cases and were decided as such and therefore are not germane.

In *Newton* the issue was whether there was only *one* invention, on which two patents could not issue, or two inventions. The Patent Office said there was only one and rejected for double patenting. There was no § 103 rejection and hence no occasion to consider what is "prior art." We held there were two inventions, that a terminal disclaimer overcame the double patenting rejection,

and reversed. That was the case. The only way § 102(g) came to be mentioned in the opinion was that the Solicitor for the Patent Office said in his *brief* that the rejection "can be considered under 35 U.S.C. 102(g), such as to be immune from any avoidance by the terminal disclaimer." But the rejection in no way involved § 102(g) and it was fitting we should have said "We find the solicitor's reliance on 35 U.S.C. 102(g) * * * inapplicable here." Truly, it had *no applicability* to the issue before us and we made no other decision about it. We cannot be said to have rejected a theory of law never relied on in the Patent Office in making the rejection and which was not before us. Briefs cannot create issues that do not exist or rejections that have not been made.

In *Frilette* there were two rejections, one for double patenting and one based on § 102(e). We affirmed the latter. The concurrence can find no decision in the opinion relating to § 102(g) because there is none. The section is referred to only in footnote 8 in which we merely pointed out that at the time of *Milburn* the statutory law for first inventorship was in R.S. 4920, which had been repealed and replaced by § 102(g). The footnote concludes, "The requirement of *first* inventorship, considered in *Milburn*, is thus implicitly continued in the present statute." That is all there is to *Frilette*. We are not overruling it any more than we are overruling *Newton*, both cases still being sound law and neither dealing with the issue here.

On what basis it can be suggested that the present decision in any way touches any of our double patenting decisions escapes our comprehension. We are not here presented with any double patenting issues. Furthermore, even if, arguendo, we take *Newton* and *Frilette* as having *said* something inconsistent with the present opinion, there remain in opposition thereto, the contrary statements we have referred to in the four opinions in *Gregg*, *Taub*, *Yale*, and *Risse*.

### Conclusion

The decision is *affirmed* as to claims 2, 3, 4, and 5 and *reversed* as to claims 1, 6, 7, 8, and 9.

Modified.

BALDWIN, Judge, concurring, with whom ALMOND, J., joins.

On the basis of the *Milburn* case, which changed the effective date of a U.S. patent from its issue date to its filing date, the principal opinion would change the effective date of all U.S. references to the unknown point in time when their subject matter was invented. On the basis of cases dealing with the rejection of a losing interference party's claims over the lost counts, the principal opinion condones the rejection of one applicant's claims over the contents of a patent where the parties' cases had never been in interference and in fact could not be put into interference under well established law. Further, the principal opinion fails to follow our previous cases which have decided the identical point of law.

It would be impossible to describe in detail all of the problems adoption of the position taken in the principal opinion would cause. The substantial problems caused by the reasoning behind the rejection before us will emerge soon enough if the position taken in the principal opinion is adopted.[1] What is particularly disturbing about the principal opinion is that it overrules a long line of our previous cases when it is not even necessary to do so. It is found in the principal opinion that the record fails to establish that Bass and Horvat were prior to Bass, Horvat and Jenkins. That being the case, the rejection must be reversed whether or not the board's

---

1. See [1973] APLA Bull. at 16–18, discussing the difficulties created by the case of Moore v. McGrew, 170 USPQ 149 (Bd. Pat.Intf.1971), which decided an interference declared between two applications which disclosed substantially different inventions.

theory regarding section 102 is correct, and there is no reason to hypothesize concerning the alleged relationships between sections 102(g) and 103 of the statute.

The principal opinion takes the position that the term "prior art" as it is used in 35 U.S.C. § 103 should include all inventions which were made in this country before an applicant or patentee made his invention, regardless of when those inventions are made public or patent applications on them are filed, so long as those inventions are found not to have been abandoned, suppressed or concealed. I disagree with that conclusion for the reasons stated hereinafter.

### I. Our Previous Cases

The principal opinion states:

[This] is the first time we have considered combining § 102(g) and § 103 in the context of an ex parte rejection entirely divorced from the award of priority in an interference which established the prior inventorship relied on in rejecting.

With all due respect, that statement is contrary to the facts. We have been faced with precisely the same theory of rejection as is before us, in an ex parte situation, entirely divorced from any award of priority in an interference, in at least two cases. In re Newton, 414 F.2d 1400, 56 CCPA 1463 (1969); In re Frilette, 412 F.2d 269, 56 CCPA 1262 (1969).

In In re Newton, *supra*, (opinion by Judge Almond for a unanimous court) the examiner had rejected the claims as "unpatentable over the claims of copending application Serial No. * * *." Appellant admitted that the cases were commonly assigned, but pointed out that the cases could not be joined because of the difference in inventors. The copending application issued as the Ingham patent. The board considered that the question before it was "whether the Ingham, Jr., patent and the instant application set forth two different inventions capable of sustaining different patents." The board concluded that

"[o]n these facts, a second patent cannot be granted, whether the same applicant or different applicants with a common assignee are involved." Taking this to be a double patenting rejection, appellant submitted a terminal disclaimer and relied on several cases, including In re Bowers, 359 F.2d 886, 53 CCPA 1590 (1966), holding that the terminal disclaimer avoids the rejection. The board dismissed the terminal disclaimer out of hand, stating:

A terminal disclaimer cannot overcome the present rejection on the facts before us. See Commissioner's notice of January 9, 1967, at 834 O.G. 1615.

That notice states in pertinent part:

In view of the uncertain situation which has arisen *as a result of recent decisions dealing with "double patenting"* it is thought to be advisable to restate the practice which should be followed in this area, particularly as regards the effect of terminal disclaimers. * * *

* * * * * *

In situations involving cases filed by different inventive entities, *regardless of ownership,* Sections 102 and 103 of 35 U.S.C. preclude the granting of two or more patents when directed to identical inventive concepts *or when one of the concepts would be obvious in view of the other. A terminal disclaimer can have no effect in this situation since the basis for refusing more than one patent is not connected with any extension of monopoly.*

In view of 35 U.S.C. 135, it is necessary to determine *priority of invention* whenever two different inventive entities are claiming a single inventive concept, and this determination should ordinarily be made before any patent is issued. This is true *regardless of ownership,* and the provision of Rule 201(c) that interferences will not be declared or continued between commonly owned cases unless good cause is shown therefor does not mean, that two patents are to be allowed in such

cases, but that the common assignee should be called on to state which of the entities involved is prior to the other in date of invention.

\* \* \* \* \* \*

If a patent is inadvertently issued on one of two commonly owned applications by different inventive entities which at the time when the patent issued were claiming inventions *which are not patently distinct,* the assignee should be called on to make a determination of priority as in the case of pending applications and, if no *election* is made, *an interference should be declared.* An *election* of the applicant as the first inventor should not be accepted without a complete (not terminal) disclaimer of the conflicting claims of the patent. [Emphasis added.]

That notice was apparently issued to overcome to some degree this court's cases in which terminal disclaimers were held to overcome obviousness type double patenting rejections, such as In re Bowers, *supra.*

The board's position was defended by the solicitor in *Newton,* who stated:

Apart from "double patenting," the examiner's rejection of claims 6 and 7 as *unpatentable over* the claims of the Ingham patent can be considered under 35 U.S.C. 102(g), such as to be immune from any avoidance by terminal disclaimer. \* \* \*

[Here the brief points out that such a rejection was actually made by the examiner, although not clearly labeled.] Here, there should be no need to go beyond the claims of Ingham as *prior art* under 35 U.S.C. 102(g), *in line with the discussion of lost interference counts in* In re Risse et al., 378 F.2d 948, 54 CCPA 1495.

The foregoing "doctrine of election" by a common assignee was discussed at length in In re Hession, 296 F.2d 930, 49 CCPA 809. [Emphasis added.]

Reliance on the notice was the *sole* reason the board held the terminal disclaimer ineffective to overcome the rejection. We did not duck the board's rejection in *Newton.* Indeed, we *could* not duck it and still hold the terminal disclaimer to be effective. Rather, we *rejected* the solicitor's suggestion that In re Risse was controlling and stated:

We find the solicitor's reliance on 35 U.S.C. 102(g) and his "doctrine of election" inapplicable here where different inventive entities are pursuing claims to *different* inventions. See *In re Frilette,* supra. We are not unmindful that the board believed that a terminal disclaimer would have no effect here and of its reference to the Commissioner's notice in 834 O.G. 1615 [4] [footnote 4 sets forth the pertinent parts of the notice] dealing with double patenting. We note only that this procedural memorandum sets forth guidelines for the Patent Office which were not even followed in this case and hence can have no bearing on its outcome here. [Footnote omitted, emphasis in original.]

Nor was this court in *Newton* relying on some imaginary part of *Frilette.* In *Frilette* (opinion by Judge Baldwin for a unanimous court) we *considered* and *rejected* the "doctrine of election" theory and the *Hession* case where "the different inventive entities \* \* \* are pursuing claims to *different* inventions." 412 F.2d at 276, 56 CCPA at 1271, emphasis in the original. That the theory which we rejected in both *Frilette* and *Newton* is exactly the same as the theory of rejection which the principal opinion suggests we adopt in this case is made clear from the solicitor's statement of it in *Frilette:*

Where the inventors are different, \* \* \* the common assignee, by electing to issue one patent, has, in effect, determined priority of invention as to any common subject matter in favor of the patentee. Taking that view, the issued patent becomes *prior art* under Section 102(g), and a terminal disclaimer would necessarily be ineffective to avoid the rejection. [Emphasis added.]

In the *Hession* case, relied on by the Patent Office in both *Newton* and *Frilette,* the pertinent facts are that two applications had been filed on the same invention by two different inventors, Ziherl and Hession. At the time of filing, both applications were assigned to the same company. This court held that in spite of the fact that Ziherl, who filed first, had filed on the latter's invention, the common assignee had made an irrevocable election with respect to priority under the cases following In re Dunbar, 278 F. 334, 51 App.D.C. 251 (1922) and In re Mann, 47 F.2d 370, 18 CCPA 1020 (1931). It was held that Hession, who had recovered ownership of his application from the original assignee, was bound by the "election" made by the original assignee when the first application was filed, and thus could not obtain a patent even though he was the original and first inventor, the original assignee had agreed to disclaim the patent which had issued to Ziherl, and an offer had been made to disclaim the term of any Hession patent beyond the expiration date of the Ziherl patent. In *Hession,* the court quoted with approval the following extract from In re Fischel, 136 F.2d 254, 30 CCPA 1085 (1943):

> We think the true doctrine of election in patent cases is grounded upon one or more of three fundamental propositions. First, the application of the doctrine prevents two patents being issued for the same invention. Second, it prevents an avoidance of the determination of priority. Third, it prevents an extension of monopoly.

The court was of the view that while there was no extension of monopoly in view of the proffered terminal disclaimer in *Hession,* the other evils could not only be prevented by holding the original assignee's "election" to be irrevocable.

Judge Rich dissented on the grounds *inter alia* that the disclaimer avoided the threat of extension of monopoly and that an assignee's election was not made irrevocable under the previous cases and there was no reason for establishing such a rule of law. The dissent contains an excellent discussion of the "doctrine of election" cases and their relationship to the cases dealing with double patenting.

In In re Frilette, *supra,* we stated that the doctrine of election as applied in In re Hession and In re Frischel does not apply when the applications are claiming *different* inventions. This distinction was recognized in the *Hession* case as being the basis for the allowance of the claims in In re Howard, 53 F.2d 896, 19 CCPA 759, (1931). See In re Hession, 296 F.2d at 933, 49 CCPA at 815. It is the identical distinction this court has maintained between double patenting rejections in which the inventions claimed are the *same* and double patenting cases in which the inventions claimed are *different* albeit not patentably different, terminal disclaimers being held effective to overcome the rejections in the latter cases. See In re Robeson, 331 F.2d 610, 614, 51 CCPA 1271, 1275 (1964); In re White, 405 F.2d 904, 56 CCPA 870 (1969). It is the *only* distinction between In re Hession and the many cases in which we have held terminal disclaimers filed by a common assignee effective to overcome obviousness-type double patenting rejections where the inventive entities are different. See, In re Bowers, *supra,* 359 F.2d at 889, 53 CCPA at 1595. Other cases involving the *Bowers* situation include In re Heyl, 379 F.2d 1018, 54 CCPA 1608 (1967); In re Borg, 392 F.2d 642, 55 CCPA 1021 (1968); In re Rogers, 394 F.2d 566, 55 CCPA 1092 (1968); In re Frilette, *supra;* In re Newton, *supra;* and others.

Of course, this court has the power to overrule all of the above cases. However, if that is the course we must take, it seems to me that we owe some explanation to the appellants in those cases and to the others who now hold patents issued on the basis of those cases why the law therein declared is erroneous. More importantly, if the law followed in those cases is wrong, let us overrule *that* law, and not institute some *new* law,

which not only invalidates those cases, but also spawns far-reaching changes in interference law, in the law governing the use of Rule 131 affidavits and their effect, and elsewhere. The principal opinion would so change the law, in a case where, under the facts it finds, the legal question which precipitates all of these changes need not ever be reached.

The only cases cited in the principal opinion which are in point are Sutter Products Co. v. Pettibone Mulliken Corp., 428 F.2d 639, (7th Cir. 1970) and the *dicta* in Ex parte Robbins, 156 USPQ 707 (1967), neither of which is binding on this court. Both are inconsistent with the view we took of the question in *Newton* and *Frilette*.

## II. The Statute

The pertinent parts of the statute read as follows:

§ 102. *Conditions for patentability; novelty and loss of right to patent*

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

\* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

§ 103. *Conditions for patentability; non-obvious subject matter*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The statute does not contain a definition of the term "prior art." [2] Nor does section 103 require that *everything* referred to in section 102 must be considered as "prior art" as that term is used therein.[3] Indeed, using the "common meaning of the words" approach to as-

---

2. In re Harry, 333 F.2d 920, 923, n. 1, 51 CCPA 1541, 1545, n. 1 (1964).

3. On close examination none of the legislative history discussed in footnote 2 of *Harry* is inconsistent with the proposition that *some* of the material in § 102 would *remain* as merely "anticipatory prior art." 333 F.2d at 923–924, 51 CCPA at 1545–1546. See note 4, *infra*. No one would

contend that section 102(c) has anything to do with prior art. Thus the statement in footnote 2 of *Harry* that " 'prior art' means *at least* those things named in section 102" is, at best, inaccurate—some of the "things" in section 102 are prior art, such as those in 102(a), and some are not, such as in 102(c). The question remains whether those in 102(g) belong to the former category or the latter.

certain the meaning of section 103, one might easily conclude that the "prior art" was intended to include only that material in section 102 in which something is "disclosed or described." However, the history of section 103 contains indications that such an interpretation would be too restrictive.[4] We are not called upon here to consider all aspects of the interrelationships between 102 and section 103. Our task is rather to decide whether a secret invention is within the meaning of "prior art," as that term is used in section 103, by virtue of section 102(g). Before dealing specifically with section (g), a short discussion of secret prior knowledge is in order.

### III. Prior Public Knowledge or Use

The doctrine that prior knowledge or use of an invention must be *public* before it can prevent the issuance of, or invalidate, a patent to another for that invention is an old one in patent law. It was firmly adopted as a ruling doctrine of United States law in the case of Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 7

L.Ed. 327 (1829). The statute governing that case was the Act of 1793, Ch. 11, 1 Stat. 318, section 1 of which provided for the grant of a patent for a:

> New and useful art * * * not known or used before the application.

The court held that "not known or used" meant not *publicly* known or used *by others:*

> What then is the true meaning of the words "not known or used before the application?" They cannot mean, that the thing invented was not known or used before the application, by the inventor himself, for that would be to prohibit him from the only means of obtaining a patent. * * * The words, then, to have any rational interpretation, must mean, not known or used by others, before the application. But how known or used? If it were necessary, as it well might be, to employ others to assist in the original structure or use by the inventor himself, or if before his application for a patent, his invention should be pirated by another, or used without his con-

4. The embryos of present sections 102 and 103 of the statute first appeared in House Comm. on the Judiciary, 81st Cong., 2d Sess., Proposed Revision and Amendment of the Patent Laws, Preliminary Draft, (Comm. Print 1950) as sections 22 and 23, respectively. Section 22 did not contain anything comparable to present sections 102(e), (f) or (g). Section 23 read as follows:

> A patent may not be obtained though the invention is not identically disclosed or described *in the material specified in section 22 of this title*, if the differences between the subject matter sought to be patented *and said material* are such that the subject matter as a whole would be obvious to an ordinary person skilled in the art. [Emphasis added.]

The pertinent language was substantially the same in section 103 of H.R. 9133, 81st Cong., 2d Sess., introduced July 17, 1950. In section 103 of H.R. 3760, introduced April 18, 1951, the pertinent language had been changed to read "disclosed or described *in the prior art set forth in section 102 of this title*, if the differences between the subject matter sought to be patented and *that* prior art are such

 * * *." In May of 1951, the Coordinating Committee (see Rich, Congressional Intent—or, Who Wrote the Patent Act of 1952? Patent Procurement and Exploitation 61, 67, 71 (BNA, 1963)) met to consider H.R. 3760. Among the changes they then suggested was the rewording of section 103, apparently in response to a suggestion from the Patent Law Committee of the Bar Association of the City of New York, which changed "*in the prior art* set forth in section 102" to "*as set* forth in section 102" and changed "*that* prior art" to "*the* prior art." According to the suggestor: "The purpose of this is to make it clear that all prior art is here meant and not merely the prior art referred to in section 102 which is limited to anticipatory art." See Hearings on H.R. 3760 before Subcomm. No. 3 of the House Comm. on the Judiciary, 82nd Cong., 1st Sess. ser. 9 at 33, 221 (1951) [hereinafter cited as 1951 hearings]. Thus it can be seen that while each change made section 102 less of a definition of what can be utilized in determining unobviousness under section 103, the phrase "disclosed or described" remained unchanged throughout this metamorphosis.

sent, it can scarcely be supposed, that the legislature had within its contemplation such knowledge or use.

We think, then, the true meaning must be, not known or used by the public, before the application.[5]

The validity of the above reasoning has not diminished one scintilla in the 143 years since it was put down on paper. To be sure, there has been an exception created to the rule that the prior knowledge must be public, in the case of an application for a United States patent. Under 35 U.S.C. § 102(e), which was derived from Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926), a U.S. patent is effective as a reference as of its application date, even though the knowledge contained in the application was not made public until the patent issued. Hazeltine Research, Inc. v. Brenner, 282 U.S. 252, 86 S.Ct. 335, 15 L.Ed. 2d 304 (1965); In re Harry, *supra*. But as this court said in In re Hilmer, 359 F.2d 859, 877, 53 CCPA 1288, 1311 (1966):

> What has always been pointed out in attacks on the *Milburn* rule, or in attempts to limit it, is that it uses, as prior knowledge, information which was secret at the time *as of which* it is used—the contents of U.S. patent applications which are preserved in secrecy, generally speaking, 35 USC § 122. This is true, and we think there is some validity to the argument that that which is secret should be in a different category from knowledge which is public. Nevertheless we have the rule. However, we are not disposed to extend that rule, which applies to the date of filing application *in the United States,* the actual filing date when the disclosure is on deposit in the U.S. Patent Office and on its way, in due course, to publication in an issued patent.

The board's new view, as expressed in this case * * *, has the practical potential effect of pushing back the date of the unpublished, secret disclosures, which ultimately have effect as prior art references in the form of U.S. patents, by the full one-year priority period of section 119. We think the *Milburn* rule, as codified in section 102(e), goes far enough in that direction. We see no valid reason to go further, certainly no compelling reason.

To push the effective date of a non-anticipatory reference backwards beyond the point where the knowledge it contains was made public to the time when its author obtained that knowledge, as we are asked to do here, would be to extend the exception to the point where it essentially swallows the rule. Section 102(e) would be turned into mere surplusage, for the application date of the patent would no longer be important, except as showing a constructive reduction to practice and except insofar as it evidences an intent not to suppress, conceal or abandon.

The *Milburn* and *Hazeltine* decisions are strictly limited to applications for U.S. patents. The question in *Milburn* was whether unclaimed anticipatory disclosure in an earlier filed application was a bar to the claims in the later filed application. The Court held that it was, stating:

> We understand the Circuit Court of Appeals to admit that if Whitford had not applied for his patent until after the issue to Clifford, the disclosure by the latter would have had the same effect as the publication of the same words in a periodical, although not made the basis of a claim. * * * The invention is made public property as much in the one case as in the other. But if this be true, as we think that it is, it seems to us that a sound distinction cannot be taken between that case and a patent applied for before but not granted until after a second patent is sought. The delays of the patent office ought not to cut down the effect of what has been

---

5. 27 U.S. (2 Pet.) at 18–19.

done. The description shows that Whitford was not the first inventor. Clifford had done all that he could do to make his description public. He had taken steps that would make it public as soon at [sic] the Patent Office did its work, although, of course, amendments might be required of him before the end could be reached. We see no reason in the words or policy of the law for allowing Whitford to profit by the delay and make himself out to be the first inventor when he was not so in fact, when Clifford had shown knowledge inconsistent with the allowance of Whitford's claim, [Webster] Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177, and when otherwise the publication of his patent would abandon the thing described to the public unless it already was old.

The Court in Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, at pages 255–256, 86 S.Ct. 335, at page 338, 15 L. Ed.2d 304 (1965) expressly followed the identical reasoning as that in *Milburn*, stating:

> The basic reasoning upon which the Court decided the *Milburn* case applies equally well here. When Wallace filed his application, he had done what he could to add his disclosures to the prior art. The rest was up to the Patent Office. Had the Patent Office acted faster, had it issued Wallace's patent two months earlier, there would have been no question here. As Justice Holmes said in *Milburn*, "The delays of the patent office ought not to cut down the effect of what has been done."

In neither case did the Court push the effective date of a U.S..patent backward in time any further than its filing date. Both of the cases rely on the proposition that a prior applicant when he filed his application "had done what he could to add his disclosures to the prior art."

They did nothing to extend the effective date to a point *before* the inventor filed his application—a point in time when he has done absolutely nothing towards "adding his disclosures to the prior art." Such a result conflicts with the rationale behind those cases. How can filing an application be a step towards adding an invention "to the prior art" if the invention itself *is* prior art at the moment it is conceived?

Note that the Court in *Hazeltine* did *not* adopt the reasoning or the dicta of In re Harry, *supra*,—it nowhere said or implied that all the material contained in section 102 is prior art within the meaning of section 103.[6] It merely held that *Milburn* made U.S. patents prior art as of their filing date and that that result was not changed by the enactment of section 102(e). As will be seen, no parallel situation, under which inventions were considered a part of the prior art *before* an application was filed on them or they were otherwise publicly disclosed, existed before the 1952 Act, and the 1952 Act was not intended to institute such a system.

### IV. Legislative History of Section 102(g)

35 U.S.C. § 102(g) deals with priority of invention. The House Report on it states:

> Subsection [102](g) relates to the question of priority of invention between rival inventors.[7]

and further:

> Paragraph [102](g) is derived from title 35, U.S.C., 1946 ed., § 69 (R.S. 4920, amended (1) Mar. 3, 1897, ch. 391, § 2, 29 Stat. 692, (2) Aug. 5, 1939, ch. 450, § 1, 53 Stat. 1212), the second defense recited in this section. This paragraph *retains the present rules of law governing the determination of priority of invention.*[8]

---

6. See note 3, *supra*.

7. H.R.Rep.No.1923, 82d Cong., 2d Sess. at 7 [hereinafter House Report]. The Senate Report, S.Rep.No.1979, 82d Cong., 2d

Sess. (1952), U.S.Code Cong. & Admin. News, p. 2394 is identical to the House Report in all pertinent respects.

8. *Id.*, at 17–18, emphasis added.

The language of section 102(g) was not settled on until late in the game. In H.R. 3760, it appeared in the following form:

> (g) before the applicant's invention thereof the invention was in fact made in this country by another who had not abandoned it and who was using reasonable diligence in this country in reducing it to practice or had reduced it to practice.

Prior to hearings on that bill, that language was objected to by many parties, on the ground that it "may be interpreted to constitute a secret reduction to practice an anticipation of an issued patent." [9] The story of how the final language was obtained is stated in the Coordinating Committee's report of the May, 1951 meeting mentioned above:

> Paragraph (g): The coordinating committee was not satisfied with either the language of the Bill or the suggested changes proposed at the meeting since none of them wholly took care of the situation. The matter was left to Mr. Federico to prepare a redraft. After consultation with others Mr. Federico recommends the following paragraph *which is intended to codify the existing law:* [10] [Emphasis added.]

Section 102(g) followed thereafter in its present form. Whether or not the other suggested changes were an attempt to codify existing law or an attempt to do away with or modify the defense of prior invention by another, it is clear from the statement of the coordinating committee and the statements in the House and Senate reports that the *final* intent behind section 102(g) was merely to codify the existing rules of law on priority of invention.

## V. Priority of Invention Prior to 1952

Determinations of priority of invention are made in two situations—in interference proceedings at the Patent Office, and in infringement actions, where "prior invention by another" is available as a defense. The rules of law governing both situations are the same. Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894).

As interference may be defined as a proceeding instituted for the purpose of determining the question of priority of invention between two or more parties claiming *the same or substantially the same invention.* Ewing v. Fowler Car Co., 244 U.S. 1, 37 S.Ct. 494, 61 L.Ed. 955 (1917); Haudenschild v. Huyck, 1910 C.D. 64, 154 O.G. 515; Brailsford v. Lavet, 318 F.2d 942, 50 CCPA 1367 (1963); Patent Office Rule 201(a); I Rivise & Caesar, Interference Law and Practice § 1 (1940); B. Baker, Outline of Patent Office Interference Practice 1 (16th ed. 1971); H. Underwood, Interference Practice § 1 (1928); II Walker on Patents § 189 (A. Deller ed. 1937); II Robinson on Patents § 586 (1890). For the history of the statutory provisions governing interferences see Rivise & Caesar, *supra,* § 2 (citing Allen v. United States ex rel. Lowry, 26 App.D. C. 8 (1905)); and Robinson, *supra,* § 587. It was extremely well settled interference law long prior to 1952, that the question of priority of invention did not arise unless the parties claimed the same, or substantially the same, invention. See Rivise & Caesar, *supra,* §§ 14, 31, 62.

Like the law governing interferences, the defense of "prior invention of another" has a long history, dating back to the Act of 1793.[11] Section 6 of that Act

---

9. Report of the Laws and Rules Committee of the American Patent Law Association, 1951 Hearings, *supra,* at 44 (emphasis added). Similar objections were voiced on behalf of the Department of Defense, *id.,* at 79, the National Association of Manu- facturers, *id.,* at 51, and others, *e. g., id.,* at 93, 192.

10. 1951 Hearings, *supra,* at 33.

11. Ch. 11, 1 Stat. 318.

listed as a defense to an infringement action "that the thing thus secured by patent was not originally discovered by the patentee, but had been in use, or had been described in some public work, anterior to the supposed discovery of the patentee." It was continued as a special defense in section 15 of the Act of 1836,[12] and was the defense raised in Gayler v. Wilder, 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850). It was ruled in that case that the prior invention had to be publicly used.[13] See also Agawan Co. v. Jordan, 74 U.S. (7 Wall.) 583, 19 L. Ed. 177 (1868); Seymour v. Osborne, 78 U.S. (11 Wall.) 516, 20 L.Ed. 33 (1870); and Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 21 L.Ed. 821 (1873). The defense was subsequently adopted in section 61 of the Act of 1870, which became R.S. 4920, the immediate predecessor of section 102(g):

> Section 61. * * * That in any action for infringement the defendant * * * may prove on trial any one of the following special matters:

> * * * * * *

> Second. That [the patentee] had surreptitiously or unjustly obtained the patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same; or

> * * * * * *

> Fourth. That [the patentee] was not the original and first inventor or discoverer of any material and substantial part of the thing patented: * * *

There has long been a distinction in the law between the defense of invalidity based on unpatentability over the prior art and the defense of invalidity based on the prior invention of another. Framed in the terminology of our present statute, that distinction is merely this: if the defense or rejection is based on *prior art*, the claim under consideration is not patentable if the differences between the subject matter claimed and the prior art relied on are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *On the other hand*, when the defense or rejection is *not* based on prior art, but rather is based on *prior invention, i. e.,* the prior invention made in this country by another who had not abandoned, suppressed or concealed it, the claimed invention *will* be patentable *unless* the prior invention is the *same* as or *substantially the same* as the *claimed* invention. Diamond Drill & Machine Co. v. Kelly Brothers, 120 F. 282 (E.D.Pa.1902), aff'd 123 F. 882 (3d Cir. 1903); Sundh Electric Co. v. Interborough Rapid Transit Co., 198 F. 94 (2 Cir. 1912); Farmer's Handy Wagon Co. v. Beaver Silo & Box Mfg. Co., 236 F. 731 (7th Cir. 1916); *cf.* Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68 (1878); Parks v. Booth, 102 U.S. 96, 26 L.Ed. 54 (1880). In other words, the differences allowed between inventions under the *prior invention* defense were *exactly the same* as the differences allowed between inventions when a determination is to be made as to whether an interference should be declared between them and *exactly the same* as the differences we have allowed in distinguishing between same invention type double patenting rejections and the obviousness type double patenting rejections. See In re White, *supra*.

The nature of the distinction is made particularly clear by the Second Circuit's opinion in *Sundh, supra*. In that case the defendant contended that Sundh's patent was invalid in view of a device disclosed in a patent to one Ihlder. The Ihlder application had been

---

12. Ch. 357, 5 Stat. 117.

13. 51 U.S. at 496–497. That case was also the first Supreme Court case in which it was held that the abandonment of a prior invention precluded its use to invalidate a later patent. 51 U.S. at 497–498.

filed prior to Sundh's, and the Ihlder patent issued after Sundh's patent issued. The defendant relied on the Ihlder patent both as a basis for a *prior art* defense, and as a basis for a *prior invention* defense. Concerning the Ihlder patent, the court stated:

> Among the patents introduced by defendant was one to Ihlder, No. 742,031, which, as was said by the Circuit Court, "so clearly resembles the Sundh patent in suit that the supposition arises that both Ihlder and Sundh were engaged at the same time in solving the problem and each invention performs substantially the same function." If either of these devices were in the prior art, there would certainly be *no invention* in devising the other. [Emphasis added.]

This was the equivalent to a holding that the two inventions were obvious in view of each other. The court denied the prior art defense, however, holding that Ihlder's prior filed application was not "prior art" as to Sundh, and that part of the court's holding was clearly overruled by *Milburn.* Concerning the *prior invention* defense, however, the court stated:

> This is a separate and distinct defense from the third one, and while evidence is not admissible to carry back the date of a later patent, by showing that application for it was filed earlier, the fact that the person who took out such later patent was himself the original and first inventor of the invention in controversy earlier than the plaintiff may be proved, as any other fact is, by competent proof. Barnes Automatic Sprinkler Company v. Walworth Mfg. Company, 7 Cir., 60 F. 605, 9 C.C.A. 154; Diamond Drill & Machine Company v. Kelly Brothers (C.C.) 120 F. 295. The various authorities cited in Judge Hazel's opinion and on the brief of appellee are concerned wholly with the other defense, prior patenting or publication.

\*　　\*　　\*　　\*　　\*　　\*

In order to maintain this fourth defense it must, of course, appear that the invention of the patent in suit and the invention of the prior application are the same. Thus in Diamond Drill Company v. Kelly, supra, the patent in suit dealt with a beltfastener, the prior application with a bed-spring. That court held that even though it should be found that these were analogous arts, and that the presence of either in a prior field of art left no room for invention in the production of the other, it could not be said that both had invented the same thing. But it does not follow that the two devices must be Chinese copies of each other to warrant the application of this particular defense.

The Court went on to compare the claims of the two patents, and pointed out that an interference should have been declared.

Is this legal distinction between prior art rejections and prior invention rejections at odds with the holdings in *Milburn* or *Hazeltine* or Western States Mach. Co. v. S. S. Hepworth Co., 147 F. 2d 345 (2d Cir. 1945) or Detrola Radio & Television Corp. v. Hazeltine Corp., 313 U.S. 259, 61 S.Ct. 948, 85 L.Ed. 1319 (1941)? It is not. Those cases are all to the effect that a United States Patent is *prior art* as of its filing date. A rejection based on section 102(e) is a *prior art* rejection, and section 103 of the statute therefore applies. While the Seventh Circuit in *Sutter Products* apparently reads the *Milburn* line of cases as charging an inventor with knowledge of all the inventions in his art being pursued in the United States, and thus declines to follow its own *Farmer's Handy Wagon Co.* case, there is absolutely nothing which requires us to so depart from the position taken by the Second Circuit in *Sundh* and by the Third Circuit in *Diamond Drill.*

With regard to Grinnell Corp. v. Virginia Electric & Power Co., 277 F.Supp. 507 (E.D.Va.1967), that case lends more

support to my position than it does to that of the principal opinion, for the court agreed with the defendant that Suozzo's work, although prior to the patentee's effective date, was *not* part of the prior art because it was not published. 277 F.Supp. at 517. The defendant did not contend that Suozzo's work, or prior invention, as it were, was part of the prior art. Rather, the defendant relied on a line of cases which indicate that simultaneous or prior invention by others, even though it is not "prior art" within the meaning of section 103 because it was never made public, may still be *evidence* under section 103 of the statute of the level of ordinary skill in the art at the time the invention. See *Grinnell, supra,* 277 F.Supp. at 518–519; Servo. Corp. of America v. General Electric Co., 337 F.2d 716 (4th Cir. 1964), cert. denied, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); Felburn v. New York Central R. R. Co., 350 F.2d 416 (6th Cir. 1965); United States Pipe & Foundry Co. v. Woodward Iron Co., 327 F.2d 242, rehearing denied 329 F.2d 578 (4th Cir. 1964). In *Grinnell* the court rejected that line of cases on the grounds that the same public policy which prohibits the use of abandoned, suppressed or concealed materials as a basis for a prior invention defense under section 102(g) should prevent their use in a prior art rejection under section 103. Thus:

> The same reasons of public policy which forbid prior suppressed and concealed activities from invalidating a patent under 35 U.S.C. § 102(g) are also applicable to 35 U.S.C. § 103.

*VI. The Doctrine of Lost Counts*

My position is not in conflict with the holdings, as distinguished from the *dicta,* in In re Risse, 378 F.2d 958, 54 CCPA 1495 (1967); In re Yale, 347 F.2d 995, 52 CCPA 1668 (1965), and In re Taub, 348 F.2d 556, 52 CCPA 1675 (1965). Those cases merely follow the doctrine of lost counts, under which the losing party's claims defining inventions which would have been obvious in view of the invention defined by the counts are rejected as unpatentable over the counts. As indicated in *Risse,* this doctrine is somewhat of an off-shoot from the doctrine of interference estoppel. It is apparently based on the proposition that the interference decision should, to the extent possible, put an end to the litigation between the parties in the Patent Office. *Cf.* In re Sola, 77 F.2d 627, 22 CCPA 1313 (1935); In re Capen, 43 App.D.C. 342 (1915); In re Wickers, 29 App.D.C. 71 (1907). The doctrine was established in this court and our predecessor in patent jurisdiction long prior to the 1952 Act, and thus the counts of an interference are presumably within the meaning the term "prior art" had attained when that statute was enacted, *as against the losing party to that interference.*

The doctrine of lost counts has *never* been extended outside of the interference situation to cover separate inventions which could never have been placed in interference. As pointed out above, this court has specifically rejected the contention that *Risse* applies in such a situation. In re Newton, *supra*; In re Frilette, *supra.* Judge Rich himself has indicated that the doctrine has not been so extended. In In re Hilmer, 424 F.2d 1108, 57 CCPA 985 (1970) (opinion by Judge Rich for a unanimous court), the opinion described the proposition "that prior 'invention * * * by another' is 'prior art' within the meaning of § 103" as being a *substantial* assumption. 424 F.2d at 1112, n. 3, 57 CCPA at 989, n. 3. The *Hilmer* opinion further states:

> As we understand the meaning of the term "priority," it refers either (a) to the issue which exists in the interference proceedings, namely, which of two or more rival inventors *attempting to patent* the *same* invention shall be deemed prior or first in law and *entitled to the patent* or (b) preservation of an effective filing date during a period such as the "con-

vention" year as against acts which would otherwise bar the grant of a patent, for the protection *of an applicant* against loss of right *to a patent.* Nothing we have seen tends to indicate that this matter of "priority" has been intended to modify the longstanding provisions of our statutes as to what shall be deemed "prior art" under § 103.[6] [Emphasis in original.]

Footnote 6 reads as follows:

We have considered the views expressed by the author of the board majority opinion herein in a concurring opinion in Ex parte Raspe, 156 USPQ 217 (1967), in a somewhat different factual situation. We think it necessary to distinguish between the right to a patent, which is only a right to exclude others, and a right to practice an invention or to be free of liability for infringement. If the law as it has been written by Congress creates anomalous situations, then it is for Congress to decide whether to change the law. In the present case we do not see the anomalous situation that was seen in *Raspe* since allowance of claims 10 and 16 would not give appellants coverage of Habicht's claim 1 compound.

Ex parte Raspe was a board decision decided 10 days after the case of Ex parte Robbins, 156 USPQ 707 (1967) relied upon for support in the principal opinion. The *Raspe* concurring opinion referred to in *Hilmer* was authored by Examiner-in-chief Federico, and his reasoning in *Raspe* essentially follows his reasoning in *Robbins.*

In the present case, the Patent Office has not advanced any new reasons for extending the doctrine of lost counts to situations not involving lost counts. There can be no question, or at least there could have been no question prior to the Commissioner's Notice of January 9, 1967, that the inventions involved here are materially different and thus no interference *could* have been declared between them. See McCutchen v. Oliver, 367 F.2d 609, 611, 54 CCPA 756, 759 (1966); Brailsford v. Lavet, 318 F. 2d 942, 945–946, 50 CCPA 1367, 1372–1373 (1963); Ex parte Manson, 146 USPQ 620 (1964); Ex parte Mercer, 1913 C.D. 195, 193 O.G. 1017; Haudenschild v. Huyck, 1910 C.D. 64, 154 O.G. 515; but see Moore v. McGrew, 170 USPQ 149 (Bd. Pat. Intf. 1971). I would therefore hold that the doctrine of lost counts has no applicability to the case before us.

In passing, it should be noted that In re Gregg, 244 F.2d 316, 44 CCPA 904 (1957), does not stand for the proposition for which it was cited in the principal opinion. From the material omitted between the portions of *Gregg* quoted in the principal opinion and from the material following those portions in the *Gregg* opinion, it is clear that the holding was based on section 102(e), not section 102(g). See In re Taub, *supra,* 348 F.2d at 563, 52 CCPA at 1683, stating that *Gregg* "was founded on the fact that 'there is no evidence to show completion of the invention covered by the appealed claims by appellant at any time prior to Coakwell's filing date,' that is, 'the Coakwell patent is a reference under Section 102(e)' * * *." To the same effect is In re Risse, *supra* 378 F. 2d at 955, 54 CCPA at 1503.

### VII. Practical Considerations

Since the law of priority of invention prior to 1952 was distinctly different from the law regarding prior art, and since it could be no clearer that the intent of the drafters of the 1952 Act was to enact the law regarding priority of invention exactly as it was at that time, the correct answer to the question before us should be crystal clear. Yet the question might be asked whether we should change that law for something better. The principal opinion would have us change that law, but it is silent as to reasons why we should do so. I have thoroughly considered the system the principal opinion would have us establish, and I have been unable to find anything desirable about it.

Consider the case before us. Here the private knowledge of the inventors, developed during the period which led to the claimed combination, is being used to set the standard of the knowledge of

the man of ordinary skill in the art. What has happened to the *objective* standard of section 103? On the record before us this knowledge could not possiblly have been known by one of ordinary skill in the art; it was not published anywhere, nor was it the subject of a pending U.S. patent application at the time the combination under consideration was made. Indeed, whoever issued the Bass and Horvat patent and the Jenkins patent considered the crucial elements of the present combination to be *unobvious* to one of ordinary skill in the art. At best, the knowledge relied on for the rejection before us represents the level of one skilled in the art who worked in a proprietary environment with the other two inventors for who knows how many years and had been assigned the task of reducing carding machine blowouts.

If we allow this subjective, secret knowledge to become the standard against which patentability is judged, we will do the public a disserve by watering down the incentive that the patent system provides for the advancement of the useful arts. Very few inventions are arrived at by a "flash of genius" or accidently, for example, by spilling a rubber composition onto the stove. Most are the result of carefully planned scientific research, often with numerous persons working on various aspects of a given problem. Invention is often reached via a large number of small steps forward. Given the possibility that the special knowledge of the inventor's coworkers developed during the pursuance of the invention would be usable against any patent based on the invention which is the end result of the research effort, investors and corporate management would, or should, be most wary of using the patent system to protect any commercially valuable invention, rather than following the trade secret route. The problems presently faced under section 102(e), see, *e. g.,* Franz, Prosecution Problems with a Plurality of Inventions From a Single Proj-

ect, 51 J.P.O.S. 559 (1969), are nothing compared to the problems which would ensue if the effective date of a patent were changed from its filing date, which is at least a definite date, to the date of "invention."

The system proposed by the principal opinion would also reek havoc with the law concerning affidavits under Rule 131 and its predecessor, Rule 75, which have long been a part of U.S. patent law. While the examiner in the case before us accepted appellants' Rusle 131 affidavits as showing invention prior to the effective date of the O'Neal reference, if "prior invention" is also "prior art," we do not really *know* the effective date of the O'Neal reference, since clearly O'Neal must have conceived his invention prior to the date on which he filed his application. Since the Patent Office has no way of knowing what a reference patent's actual date of invention is, it would have to issue patents in cases where the filing date of the reference is overcome, even though a large number of such patents would be invalid.

Consider the plight of two inventors who *independently* develop inventions which are materially different from, but obvious in view of, each other. The reasoning of the principal opinion would force both inventors into an expensive and burdensome interference contest in which they could only lose. While the winning party could keep the claims he had, he could not claim the loser's invention because the winner "did not himself invent the subject matter." 35 U.S.C. § 102(f). The loser, of course, would gain nothing, and his application would ordinarily never be published.

We need not further dwell on the vagaries of a system under which priority contests must be waged between inventions which differ substantially but would have been obvious one in view of the other, for there is absolutely no indication that such a radical change in the law was intended by the drafters of the 1952 Act. As noted above, all indica-

tions are that no change at all was intended. An even stronger indication of the same intent is to be found in the Act itself, section 135(b) of which discusses interferences between applications and issued patents for "the same or substantially the same subject matter * * *."

Are we to rule that interferences must now be declared between inventors whose inventions are substantially different from one another but those differences are such that the one would have been obvious in view of the other? Such a result would inevitably follow from a holding that the prior invention of § 102(g) must be applied as the standard against which a determination must be made as to whether a patent may be granted under 35 U.S.C. § 103. In fact, such an interference was the only course the board left open to appellants in the present case by which they might overcome the Bass and Jenkins references. The board stated:

The first three lines of Rule 131 are as follows:

"When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes *but does not claim* the rejected invention," (Emphasis added.)

In our opinion, it is claimed subject matter rather than the unclaimed subject matter of the Bass, Jr. et al. and Jenkins, Sr. patents which is being relied upon. The specific manner in which the claims of the Bass, Jr. et al. and Jenkins, Sr. patents are drawn does not indicate otherwise.

Under the circumstances here involved it does not appear that an affidavit under Rule 131 was the proper procedure to adopt.

The "proper procedure" to overcome a domestic patent which *claims* the rejected invention is to file an affidavit under Rule 204 and provoke an interference. The prospect of a two or three way interference between appellants Bass, Horvat and Jenkins, patentees Bass and Horvat and patentee Jenkins seems ludicrous indeed. It should be noted, however, that before the board appellants pointed out that "[t]here is nothing in the affidavits to suggest that the Jenkins screen or the Bass plenum were used separately before they were brought together in the claimed combination," and the principal opinion itself concludes that there is no showing that the plenum is prior to the combination. There was no application filed on, and thus no constructive reduction of, either the plenum or the screen prior to the alleged actual reduction to practice of the presently claimed combination. If *either* the plenum *or* the screen had not been actually reduced to practice prior to the first use of the combination, the question as to which was actually the first conceived would be presented. The Rule 131 affidavits submitted here were clearly not directed to that question. Apparently the board felt that that question could only be resolved by such an interference. Indeed, the last paragraph of the Commissioner's Notice quoted supra *requires* that an interference be declared, contrary to the law of priority of invention embodied in section 102(g), contrary to the specific language of 35 U.S.C. § 135(b), and contrary to the settled case law that claims do not interfere unless they are directed to the same, or substantially the same invention. Such a course has been followed by the Patent Office at least once. See Moore v. McGrew, *supra,* note 1. On the other hand the Patent Office could follow the established law and hold that claims to different inventions do not interfere even if the inventions are obvious in view of each other. The net result of that holding would be to eradicate all the methods by which an applicant could find out the *actual* effective date of *any* reference, whether the reference was filed or published before *or* *after* the applicant's filing date, save one—he will find out the *actual* effective date of the reference when it is interposed against his patent in an infringement or a declaratory judgment action.

*Conclusions*

At the heart of the reasoning behind *Yale, Taub* and *Risse* is the proposition that *everything* in section 102 is prior art. That reasoning is an easy trap to fall into, for much of what *is* in section 102 is also prior art under previous law. However, as I have endeavored to show, that reasoning conflicts with the real intent behind the statute. Rather than make such a broad generalization about section 102 and then follow it blindly, this court should carefully scrutinize each section thereof to determine the meaning of the statutory language and the intent behind it. That was the course followed by Judge Jackson in the opinion which the Supreme Court affirmed in Hazeltine v. Brenner, *supra*. There he said:

> [I]n view of the fact that the "prior art" under 35 U.S.C. § 103 is not limited to materials which an inventor knows or could reasonably be expected to know, the question of whether a copending patent is to be considered a part of the "prior art" under 35 U.S.C. § 103 is a *matter of policy*. Because of the fact that the policy, the case law prior to the 1952 Act was to include "copending patents" in the prior art in situations analogous to those now covered by Section 103, it is the opinion of the Court that there would have to be clear, unmistakable language in the Patent Act of 1952, or in its legislative history before a Court would be warranted in holding that "copending patents" are not "prior art" under 35 U.S.C. § 103.
>
> The Court has not found, nor has Counsel for plaintiffs directed its attention to any such language. *The Patent Act is unclear on this point* \* \* \*. [Footnote omitted, emphasis added.]

Hazeltine v. Ladd, 226 F.Supp. 459 (D.C. D.C.1964) aff'd per curiam, 119 U.S. App.D.C. 261, 340 F.2d 786 (1964), aff'd 382 U.S. 252, 86 S.Ct. 335, 15 L. Ed.2d 304 (1965).

To summarize my position, the legislators clearly intended to enact the law of priority of invention exactly as it stood in 1952. As it stood then the question of priority only arose between inventions which were the same, or substantially the same. The decisions dealing with references which are U.S. patents do not conflict with that law and it has not otherwise been overruled. There are no policy considerations which would dictate changing that law, and many policy considerations against such a change. I would reverse the rejection of claims 1 and 6–9 on the basis that the elements invented by Jenkins and by Bass and Horvat are not prior art with regard to the Bass-Horvat-Jenkins combination. I note that no rejection of these claims on the basis of double patenting is before us, although absent a terminal disclaimer such a rejection would appear proper. I agree with the affirmance of the rejection of claims 2–5.

LANE, Judge (concurring).

I concur in the result reached by both Judge Rich and Judge Baldwin in this case. I affirm the rejection of claims 2, 3, 4 and 5 as obvious under § 103 in view of Reiterer and Fuji. I reverse the rejection of claims 1, 6, 7, 8 and 9 on Bass combined with Fuji and Jenkins. I agree with Judge Rich that there is no substantial evidence of record tending to indicate priority in Bass and I therefore exclude Bass from consideration as prior art here in passing on the obviousness rejection of these claims.

Both Judge Rich and Judge Baldwin have expounded at great length on whether or not § 102(g) makes available as prior art within the meaning of § 103 the prior invention of another who has not abandoned, suppressed or concealed it. In my opinion, the inconsistent conclusions of these judges on this point constitute statements of law which I consider not necessarily involved nor essential to the disposition of this appeal. However, since the particular court which heard this appeal argued is ob-

viously divided on this proposition, as evident from the extensive treatment accorded it in both opinions, I deem it advisable for me to make of record my view that the prior invention of another who had not abandoned, suppressed, or concealed it, *under the circumstances of this case* which include the disclosure of such invention in an issued patent, is available as "prior art" within the meaning of that term in § 103 by virtue of § 102(g).